## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ESTATE OF CHRISTINA ROGERS, by and through its personal representative ANNA PETERMAN; and
ANNA PETERMAN,

      Plaintiffs,

v.

TURN KEY HEALTH CLINICS, LLC;
BOARD OF COUNTY COMMISSIONERS, WELD COUNTY;
SHERIFF STEVE REAMS, in his official capacity;
ROBYN JUBA, individually;
JAYME SCHIPPERT, individually; and
TERESA SIPOLA, individually,

      Defendants.

_____

## CIVIL RIGHTS COMPLAINT AND JURY DEMAND
_____

Plaintiffs, through their attorney, Aurora L. Randolph of ALR Civil Rights LLC, hereby submit this Complaint against all Defendants and request a trial by jury as follows.

## I.      INTRODUCTION

1.      On January 2, 2023, Christina Rogers, a 44-year-old loving mother and grandmother, died while in the custody of the Weld County Sheriff's Office ("WCSO") and the care of private medical contractor Turn Key Health. Her death was entirely preventable. The hole that is left in her family's life could have been avoided had she received the care she needed.

2.     Tragically, after she was arrested in 2022, Ms. Rogers was locked in a facility that chose cost savings over the wellbeing of the individuals in its custody and under the care of a company that systematically understaffed its medical operations and allowed its staff to cut corners without consequence.

3.     Ms. Rogers entered the Weld County Jail reporting that her mental health conditions were severe and currently untreated and with a recent diagnosis of blood clots.  Turn Key officials were aware that she had recently been hospitalized for her condition.  But they failed this vulnerable woman despite their knowledge that she had pressing medical concerns on top of significant struggles with her mental health, including with repeated suicide attempts.

4.     Ms. Rogers died before she could get out of jail and tell her story.  But her medical records reflect six weeks in the Weld County Jail where Ms. Rogers went untreated for her serious mental illnesses and her blood clots.  Employees for the for-profit medical provider, Turn Key, let Ms. Rogers deteriorate to the point that she went weeks without medication and then died of pulmonary embolism even though the individual Defendants were aware of her medical needs, her shocking prolonged failure to be treated, and her worsening symptoms.

5.     Some civil rights cases involve poor decision making over the course of a day or two by individuals with the responsibility to act.  This case is different – and perhaps more shocking.  An entire medical operation inside one of the largest jails in Colorado allowed a woman to die in custody over the course of six weeks.  Turn Key staff and the individual Defendants knew she was unwell and knew she was untreated, yet they rubber stamped her lack of treatment and ignored her complaints that her blood clot was worsening.  They allowed her to remain untreated and instead short cut their obligations to meet and counsel her for weeks on

end.  Turn Key officials ignored her because they didn't have the time or expertise to adequately treat her complex mental and physical situation.  In violation of policy, she was allowed to go untreated and without her blood clot medication and many of her psych medications for six weeks.

6.      Turn Key's systematic failures are laid bare in Ms. Rogers' medical records. Staff failed to properly categorize her in her intake as an inmate that needed to be in chronic care for her blood clots.  She did not receive regular mental health care despite her suicidality and mental health diagnoses.  Throughout her incarceration, over-extended staff failed to counsel and even document the repeated failures to give her medication.  The individual Defendants and other Turn Key staff failed for weeks to provide her medication compliance counseling in violation of policy to save time and resources.  Turn Key officials failed to see her when she complained of leg pain from her blood clots.  And Defendant Sipola recklessly knew of her crisis but rescheduled an appointment with her twice – and during that wait Ms. Rogers died.  Turn Key's failure to staff and ensure that vulnerable inmates were provided regular care allowed Ms. Rogers to suffer for weeks unmedicated.  And Weld County knew of Turn Key's understaffing and cost-cutting mentality and continued to allow it to provide the "care" within its jail.

7.      Without treatment, Ms. Rogers' blood clot traveled to her lungs, and predictably, she eventually died a painful death from a pulmonary embolism at just 44 years old.  She left behind a large family and many grandchildren who will never again be able to celebrate Christmas or other life events with their beloved grandma.



*(Ms. Rogers, left, and Ms. Peterman, right)*

## II.    JURISDICTION AND VENUE

8.    This action arises under the Constitution and laws of the United States and the State of Colorado including Article III, Section 1 of the United States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.  The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

9.    Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent state causes of action derive from a common nucleus of operative facts.

10.    Jurisdiction supporting the claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-131(3).

11. This Court has personal jurisdiction over all the named Defendants because they either reside in the State of Colorado or they conduct systematic and continuous business within the State of Colorado.

12. Venue in the District of Colorado is proper under 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

13. Plaintiffs provided a timely notice of claims under the Colorado Governmental Immunity Act (CGIA) to the Weld County Board of County Commissioners, Weld County Sheriff Steve Reams, the Weld County Attorney's Office, and Turn Key pursuant to C.R.S. § 24-10-109. However, the state law claims in this matter brought against the private corporation (Turn Key) do not require a notice of claims under the CGIA.

### III.    PARTIES

14. At all times relevant to this Complaint, the decedent Christina Rogers, was a citizen of the United States and a resident of the State of Colorado.

15. At all relevant times, Ms. Rogers was a pretrial detainee at the Weld County Jail ("the jail" or "WCJ").

16. The Estate of Christina Rogers was opened in Boulder County and the personal representative of her Estate is her daughter, Anna Peterman.

17. Anna Peterman is the daughter of the decedent Christina Rogers and is a citizen of the United States of America and a resident of the State of Colorado.

18. The Defendant Board of County Commissioners for the County of Weld, Colorado ("BOCC") is a governmental entity chartered under the laws of the State of Colorado,

located at 1150 O Street, Greeley, Colorado.  The BOCC, through the Weld County Sheriff's

Office ("the Sheriff"), operates the jail, located at 2110 O Street, Greeley, CO 80631.  BOCC

represents, oversees, and sets policy for Weld County Colorado and contracted with Defendant

Turn Key Health Clinics, LLC to fulfill its Constitutional obligation to provide health care to the

inmates at the jail.

19.     Defendant Steve Reams, in his official capacity, is the Weld County Sheriff.

Sheriff Reams is a final policy maker for Weld County with respect to all matters concerning the

Sheriff's Office and all of its divisions, including the Weld County Jail.

20.     The Weld County Sheriff and the BOCC are collectively referred to herein as

"County Defendants," or "the County."

21.     The County Defendants are proper defendants under 42 U.S.C. § 1983.  Although

the County has privatized the provision of healthcare services in the jail, it has a non-delegable

duty under 42 U.S.C. § 1983 to provide constitutionally adequate care, cannot contract away its

constitutional obligation, and is legally liable for the challenged deliberately indifferent polices,

practices, customs, and training by such private contractors.

22.     Defendant Turn Key Health Clinics, LLC, is a private Oklahoma corporation

doing business in the state of Colorado with its principal address located at 900 NW 12th Street,

Oklahoma City, OK, and its registered agent in Colorado at InCorp Services, Inc., 36 South 18th

Avenue, Suite D, Brighton, CO 80601.

23.     Defendant Turn Key is a proper entity to be sued under 42 U.S.C. § 1983 for their

deliberately indifferent policies, practices, habits, customs, procedures, training and supervision

of staff with respect to the provision of medical care and treatment for inmates.  Upon entering

into contracts or subcontracts to provide medical and/or other services to Weld County inmates,

Turn Key assumed public functions, acted under color of state law, and is legally responsible to

comply with all requirements of the United States and Colorado Constitutions.

24. Turn Key is also properly sued for its own negligence and the negligence of its

agents and employees under state law.

25. At all times relevant to this Complaint, Defendant Robyn Juba was a

Psychotherapist for Turn Key at the Weld County Jail. Defendant Juba was an agent, employee,

and/or subcontractor of Turn Key Defendants, and was responsible for providing medical care to

Christina Rogers during her incarceration. At all material times, Defendant Juba was acting

under the color of state law. Defendant Juba was a citizen of the United States of America and

was a resident of the State of Colorado at all times relevant to the Complaint.

26. At all times relevant to this Complaint, Defendant Teresa Sipola was a Nurse

Practitioner for Turn Key at the Weld County Jail. Defendant Sipola was an agent, employee,

and/or subcontractor of Turn Key Defendants, and was responsible for providing medical care to

Christina Rogers during her incarceration. At all material times, Defendant Sipola was acting

under the color of state law. Defendant Juba was a citizen of the United States of America and

was a resident of the State of Colorado at all times relevant to the Complaint.

27. At all times relevant to this Complaint, Defendant Jayme Schippert was a

Registered Nurse for Turn Key at the Weld County Jail. Defendant Schippert was an agent,

employee, and/or subcontractor of Turn Key Defendants, and was responsible for providing

medical care to Christina Rogers during her incarceration. At all material times, Defendant

Schippert was acting under the color of state law. Defendant Schippert was a citizen of the

United States of America and was a resident of the State of Colorado at all times relevant to the

Complaint.

## IV.    FACTUAL ALLEGATIONS

**A.    Weld County's Initial 2019 Contract with Turn Key**

28.    At all times relevant to this Complaint, the County contracted with Turn Key to

provide medical and mental health care and treatment to detainees and inmates at the Weld

County Jail.

29.    In September 2019, the BOCC issued a public Request for Proposal for Inmate

Medical Services seeking bids for proposed contracts to serve as the medical provider at the jail

30.    In Turn Key's 2019 bid for the contract with the County, Turn Key emphasized

its pricing and staffing models were aimed at reducing costs to the County (thereby increasing

Turn Key's profits through continued and expended contracting) by boasting about specific

instances Turn Key refused to hospitalize inmates in other jails (marketed as "reducing unwanted

offsite costs") and the additional cost savings to jails in not having to provide security for

inmates off-site in hospitals.

31.    In its $4.5 million dollar contract with the County, Turn Key agreed to cover up

to $125,000 in offsite and specialty care costs per year, despite understanding there would be, on

average, more than 800 detainees in their care at any given time.

32.    Any amount over $125,000 spent on offsite costs per year would become the

financial responsibility of the County.

33.    Thus, Turn Key had a strong financial incentive not to send inmates out because then it's customer (the County) could be on the hook for those costs and would have financial incentive to consider other contractors for the job.

34.    Similarly, the County had financial incentive not to press Turn Key to pursue offsite and specialty care for its inmates.

35.    Turn Key and six other private companies submitted bids for a medical contract with the County in 2019.

   a.    *Turn Key Planned to Understaff the WCJ from Its Initial Contract Bid*

36.    Turn Key touted its "overall lower cost" compared to other vendors and "affordable" renewal rate which would "save the Weld County taxpayers additional money" in future years.

37.    In its initial bid to the County, Turn Key explicitly proposed understaffing the jail's medical operation to save costs.

38.    The County was aware the Turn Key had proposed a total staffing allocation at the jail that was facially insufficient to meet the needs of the inmates in Turn Key's effort to present the lowest priced bid.

39.    Specifically, the County knew that Turn Key had underestimated, understaffed, and under bid its medication administration operations.

40.    Indeed, instead of ruling Turn Key out of running for the contract, the County contacted Turn Key during the initial bidding process and requested it submit a revised total staffing allocation plan and cost estimate with increased adequate staffing reflected.

41.     In its October 2019 "Revised Staffing Plan" sent to the County, Turn Key admitted that its original staffing matrix and bid was insufficient to meet the needs of the jail.

42.     And the insufficient staffing level proffered by Turn Key to ensure it had the lowest bid was not minimally short staffed, it was *significantly* deficient.

43.     The revised staffing plan added an additional 12 hours of medical staffing a day or 84 hours a week.

44.     In addition to the Turn Key bid, the County received several other bids that also met its requirements.

45.     According to Turn Key's initial bid to the County, its proposal reduced the cost to the County by over $75,000 compared to the County's then-medical provider.

46.     Undeterred by Turn Key's initial plan to understaff the jail, ultimately, WCSO Lt. Elbe sent the BOCC a recommendation that they contract with Turn Key because "Turn Key Health was the low bid."

47.     And on December 11, 2019, the BOCC on behalf of the Weld County Sheriff's Office, entered into a contract with Turn Key to provide medical and mental health care to individuals in its custody at the jail.

48.     When the County decided to contract with Turn Key to provide medical services at the jail, Turn Key had been repeatedly sued for its inadequate medical care at numerous facilities across the country.[1]

49.     On information and belief, the BOCC made the decision to contract with Turn Key solely because Turn Key was the lowest bidder.

---

[1] *See infra* section K.

50.     There were no specific provisions for the County to enforce staffing requirements

in the contract.

**B.      Weld County Continued to Contract with Turn Key Despite its Known Failures**

51.     On information and belief, Turn Key's medical operation at the WCJ was

understaffed from 2020-2023.

*a.   The County and Turn Key Briefly Increase Staffing After Class Action Lawsuit, Then*
*Return to Deficient Staffing*

52.     In April 2020, the American Civil Liberties Union of Colorado (and others)

("ACLU") brought a class action lawsuit against Defendant Sheriff Steven Reams seeking an

emergency order to compel the jail to comply with COVID-19 public health guidelines

(*Carranza v. Reams*).  The suit alleged, *inter alia*, that "current conditions in the Weld County

Jail pose a serious, obvious, and emergent health and safety risk to inmates, staff and the public."

53.     Turn Key was the medical provider at the jail at the time of the class action

lawsuit.

54.     Before filing suit, the ACLU contacted Defendant Reams pointing out the

deficiencies in the jail and medical operations in an unsuccessful attempt to protect its vulnerable

inmate population.

55.     Indeed, Defendant Reams made a public statement on Facebook stating*, inter*

*alia*, "The Weld County Jail has very competent and effective medical staff to handle this

crisis…"

56.     But, after the suit was filed, Defendant Reams ultimately resolved the class action

case after agreeing to a consent decree mandating medical best practices including medical

identification of vulnerable inmates, adequate testing, and regular monitoring of vulnerable inmates by medical staff – all of which were alleged to be deficient at the jail at the time.

57.     On December 16, 2020, the County and Turn Key amended their contract to briefly increase medical staffing for 12 months (hereinafter "increased staffing amendment").

58.     But immediately after the consent decree ended in that case, the County and Turn Key reverted back to their understaffing pattern for the medical operation at WCJ.

59.     A 2022 email from a WCSO Lieutenant to Turn Key demanded Turn Key reimburse the County for an increased staffing cost that went beyond the last day of the consent decree.

60.     The Lieutenant stated the additional staffing "ran through the ending of the consent decree we were involved in with the ACLU which was in June 2021," and "the moment that the consent decree ended and the need for those additional [full-time employees] went away," the County would not be willing to pay for any additional staffing.

61.     But, obviously, the end of a court-mandated staffing increase does not mean that the staffing doesn't need to be maintained to inmate well-being, it just means that a court is no longer requiring it.

62.     Thus in 2022, the County was aware of Turn Key's staffing deficiencies but insisted that it would not pay for additional medical staffing.

63.     The County did not require Turn Key to increase its staffing at that time.

b.  *The County Continues Contracting with Turn Key Without Additional Staffing or Oversight Provisions*

64.     The initial Turn Key-County contract expired December 31, 2020.

65.     On December 16, 2020, the contract was renewed and extended until December 31, 2021.

66.     On September 5, 2021, inmate Amy Cross died in custody from a shocking overdose and inadequate medical care by Turn Key staff.  (See infra section K.)

67.     On information and belief, the County was aware of the death and should have reviewed the review of the failures that led to it within weeks of the death.

68.     Defendant Sipola was at the middle of Ms. Cross' death.

69.     Defendant Sipola treated Ms. Cross' overdose symptoms as disobedience, she knew that Ms. Cross was exhibiting emergency symptoms requiring hospitalization, and Sipola decided she would not be sent out regardless of how sick she became – despite the fact Sipola never actually saw Ms. Cross.  And she died shortly thereafter.

70.     Turn Key and the County retained Defendant Sipola after this incident.

71.     But, on December 10, 2021, the County extended the contract with Turn Key until December 31, 2022 with no additional oversight provisions, staffing requirements, or any other quality assurance measures from the previous contract - just a 2.95% increase in what the County would pay Turn Key ($4,712,529.30 total).

72.     In fact, the 2021 contract extension explicitly stated the increased staffing amendment "is no longer needed, therefore, the amendment is no longer binding on either party."

73.     In other words, the County agreed to a Turn Key staffing *decrease* from December 2021 onwards.

74.     In August 2022, the County began preparing for another contract extension with Turn Key, despite the County's awareness of the chronic short staffing by Turn Key at the jail up to that point.

75.     For example, on August 3, 2022, WCSO Lieutenant Kevin Halloran wrote to Turn Key's client liaison and stated:

> I'm working on the contract extension for 2023 with Turnkey. Are you able to provide the monetary details for 2023? Is there going to be an increase? If so, how much? Also, **any word on the recruiting front for nurses? As shorthanded with nurses as you/we are, I'm hoping Turnkey understands this and if an increase is inevitable will the nurses be staffed**?

(emphasis added.)

76.     Contract discussions for the January-December 2023 contract show that the County was aware of Turn Key's failure to adequately staff its medical operation.

77.     Clearly, the County was well-aware of the ongoing staffing deficiencies by Turn Key at the WCJ, but they continued to contract with Turn Key and left the people locked up in their custody to suffer the consequences of understaffed care.

78.     And Ms. Rogers died mere days into the 2023 contract, as described below.

## C.     Ms. Rogers' Had a Well-Documented History of Suicidality and Mental Health Struggles at the Weld County Jail

79.     Ms. Rogers struggled with severe mental health and substance abuse problems that, very unfortunately, rendered her deeply entrenched with the criminal justice system; and Ms. Rogers had a long history of incarceration at the WCJ before her death in 2023.

80.     She had serious mental illness and needed regular support and treatment to be well enough to take care of herself.

81.    The following information was in Ms. Rogers' WCSO/Turn Key medical records before her November 2022 incarceration:

a) In 1996, Ms. Rogers attempted suicide;

b) In 2014, Ms. Rogers attempted suicide by cutting herself while in the custody of the Colorado Department of Corrections;

c) In 2015, Ms. Rogers attempted suicide by hanging herself while in jail custody;

d) In 2016, Ms. Rogers attempted suicide by overdosing and was hospitalized and placed on a mental health hold;

e) In 2017, Ms. Rogers was incarcerated in the jail and placed on suicide watch; and

f) In 2018, Ms. Rogers was again placed on suicide watch at the jail because she was "engaged in self mutilating behavior, cutting arm with knife, on multiple occasions;"

g) A 2018 note from the jail's psychotherapist details Ms. Rogers' years of encounters with the jail stating things like:

i. Ms. Rogers was on suicide watch on several different occasions before and during 2018 while at WCJ for her suicidality and mental health problems;

ii. Ms. Rogers had a documented history of repeated suicide attempts, self-mutilating behavior, and failure to take her medications;

iii. Ms. Rogers had known diagnoses of depression, Bipolar Disorder, PTSD, and anxiety and was a daily user of methamphetamine.

82.    Thus, Ms. Rogers struggled to take care of herself and make informed decisions about her wellbeing.

83.     In addition to the above, Ms. Rogers was also incarcerated at the WCJ in February 2022 and May 2022.

84.     During her February 2022 incarceration, Ms. Rogers was placed on suicide watch in the WCJ due to her above-documented history, the fact that she had a cut on her arm and reported recent self-mutilation, and was having thoughts about cutting herself prior to her arrest. Turn Key records show she had reported cutting herself the day before her intake and had self-harming thoughts the day of her intake.

85.     During her May 2022 incarceration at the WCJ, Ms. Rogers was again placed on suicide watch "due to having [suicide] risk factors," and having an outburst during intake (described as "screaming, and throwing herself around while crying").

86.     During her May 2022 intake at the WCJ, she confirmed her documented mental health history – *i.e.* her suicide attempts, suicide watch placement, medications, and mental health diagnoses.

87.     In sum, Ms. Rogers had a well-known and well-documented history of suicidality, mental health struggles, and related failure to take her medications that Turn Key and WCSO staff had in their possession at the time she was incarcerated in November 2022.

88.     In the years leading up to her November 2022 incarceration, Ms. Rogers had several documented suicide attempts that the WCSO and Turn Key, including Defendants Juba, Sipola, and Schippert, were aware of.

89.     Moreover, she had been on suicide watch at that very jail several times in months leading up to her November 2022 incarceration, which WCSO and Turn Key, including Defendants Juba, Sipola, and Schippert, were aware of.

90.     All of this information was contained in Ms. Rogers' medical record at the WCJ. All Turn Key staff, including Defendants Juba, Sipola, and Schippert, would have been able to see this information regarding Ms. Rogers and should have reviewed it when providing her care.

91.     To state the obvious, the individual Defendants and other Turn Key staff knew that Ms. Rogers was unwell and that she needed medical intervention to ensure that she was taking care of herself and making rational decisions about her health.

**D.    Ms. Rogers' September 2022 Arrest and Brief Incarceration at Boulder County Jail**

92.     On September 29, 2022, Ms. Rogers was arrested by the Longmont Police Department.

93.     Upon her arrival at the Boulder County Jail ("BCJ"), Ms. Rogers was sent to Boulder Community Hospital for medical clearance because she was experiencing a loss of feeling in her legs.  She was diagnosed with sciatica of the left side and cleared for incarceration.

94.     When Ms. Rogers was booked into BCJ, she could walk for short distances with the assistance of a cane and was unable to stand for long periods of time.  She was provided with a wheelchair to use at the BCJ.

95.     In October 2022, Ms. Rogers began reporting to BCJ medical staff that her left leg was swollen, tender, and painful, and she was seen by BCJ medical staff who extensively documented her condition.

96.     On October 11, 2022, Ms. Rogers was taken to Longmont United Hospital ER while incarcerated in the BCJ for pain in her left leg as well as swelling and tenderness.

97.     At the emergency department, she was diagnosed with thrombophlebitis, specifically acute deep vein thrombosis ("DVT") of popliteal vein of left lower extremity, *i.e.* a blood clot in her leg.

98.     The hospital records from this ER visit also reflect Ms. Rogers' anxiety, bipolar disorder, depression, hypertension, and history of self-harm, among other conditions.

99.     At the ER, Ms. Rogers was prescribed the anticoagulant medication Xarelto.

100.     Xarelto is used to treat and prevent blood clots.  It is a prescription blood thinner that lowers the risk of stroke, DVT, pulmonary embolism, and similar conditions.

101.     Ms. Rogers was medically cleared for incarceration.  But her hospital discharge instructions state she needs to return to the hospital if her condition worsens or for further concerns, and that she needed a follow-up to discuss blood-thinners and to repeat the ultrasound.

102.     If left untreated, a blood clot can cause a pulmonary embolism – a potentially life-threatening situation where the clot travels to the lungs and blocks blood flow.

103.     BCJ received these hospital records.

104.     Her thrombophlebitis was noted throughout her BCJ medical record, and BCJ medical staff assessed Ms. Rogers and her leg for signs of redness or swelling at least once a day and often more frequently.

105.     BCJ sent Turn Key these hospital records in November 2022.

106.     A few weeks later, on November 4, 2022, at the BCJ, Ms. Rogers underwent an ultrasound at BCJ and Ms. Rogers still had thrombosis, a blood clot, in her left leg.

107.     Thus, it was clear that Ms. Rogers' body had not absorbed the clot, her condition was still serious, concerning, and potentially life-threatening.

108.    Her Xarelto prescription was continued.

**E.    Ms. Rogers' November 18, 2022 Intake at the Weld County Jail Shows the Individual Defendants and Turn Key Staff Were Aware Of Her Blood Clots and Disregarded The Substantial Risk of Harm They Presented**

109.    On or around November 18, 2022, Ms. Rogers was booked into the Weld County Jail after being transported there directly from Boulder County Jail.

110.    BCJ officials provided Turn Key and WCSO paperwork documenting Ms. Rogers' recent diagnoses of DVT, blood clots, and hospital visits, as well as her prescription for Xarelto and other psychotic mediations.

111.    Xarelto is an expensive medication.  It costs approximately $609 for a 30-day supply.

112.    Ms. Rogers – having been incarcerated twice at the WCJ that year alone – was well-known by Turn Key and WCSO officials.

113.    Ms. Rogers noted she had chronic conditions (blood clots) and a history of severe mental illness on her November 18, 2022 COVID-19 Screening Questionnaire.

114.    During intake on November 18, 2022, Turn Key officials conducted routine medical and mental health screenings on Ms. Rogers.

*a.    Mental Health and Suicide Screenings*

115.    Ms. Rogers' mental health and suicide history was well known and documented during her November 2022 intake.

116.    Defendant Psychotherapist Robyn Juba compiled and listed Ms. Rogers' Mental Health Historical Data during intake which included all of the suicide attempts and suicide watch placement noted *supra* ¶ 80.

117.    Defendant Juba recorded that Ms. Rogers confirmed her previous mental health history – i.e. her suicide attempts, suicide watch placement, and mental health diagnoses including "PTSD, Anxiety, and Severe Depression."

118.    On information and belief, Defendant Juba had seen Ms. Rogers as a patient at WCJ since at least 2016.

119.    Thus, Defendant Juba was aware of Ms. Rogers' previous mental health history – i.e. her suicide attempts, suicide watch placement, and mental health diagnoses.

120.    Defendant Juba also conducted a suicide assessment of Ms. Rogers during her November 2022 intake based on the fact that she had previously attempted suicide and on referral by Turn Key Inmate Services Clinical Supervisor B. Williams.

121.    Not all incarcerated people receive a suicide assessment, just those who may be at an increased risk of suicide.

122.    In the suicide assessment, Defendant Juba noted that Ms. Rogers had a history of traumatic brain injury because she said she was "kicked in the head in October 2022 and lost consciousness," in a domestic violence incident.

123.    Brain injuries can worsen mental health conditions and cognitive functioning, as any medical professional knows, and it a factor in considering whether to place an individual on suicide watch.

124.    Defendant Juba noted that Ms. Rogers requested a visit with a counselor if she was not released quickly because she had not been able to receive her mental health medications while she was incarcerated in BCJ and she wanted to take them.

125.    Defendant Juba noted Ms. Rogers told her, "She last took medications in February/2021.  I was on a waitlist in Boulder Jail before I came here but never got them."

126.    On two other parts of the suicide assessment, Defendant Juba noted that Ms. Rogers had not been taking her prescribed psych medications despite her desire to do so.

127.    Defendant Juba noted "[follow-up] requested" on the suicide screening assessment form.

128.    Defendant Schippert conducted Ms. Rogers' mental health screening on November 18, 2022.

129.    Defendant Schippert falsely and recklessly recorded that Ms. Rogers **was not** on medications for mental health conditions and that Ms. Rogers **had not** attempted to harm herself in the last year or presented signs or conditions of recent suicide attempts or self-harm.

130.    As was clear from her medical record, Ms. Rogers **was** prescribed mental health medications for her various diagnoses (though she didn't have access to them at the time) and she **had** attempted suicide on many occasions.  Indeed, Ms. Rogers had been placed on suicide watch *in the WCJ* a few months previously.  Even a cursory review of her records reveals her concerning mental health concerns.

131.    Defendant Schippert also falsely documented that Ms. Rogers had not been hospitalized for mental health problems in the past, and he labeled Ms. Rogers as an inmate with a "stable [mental health] condition" and placed her in general population.

132.    Clearly, Ms. Rogers was desperate for mental health treatment and repeatedly requested help from the medical officials booking her into the WCJ.  She also reported to

Defendant Juba that she had been without her mental health medications for some time but wanted to take them.

    *b.* <u>*Medical Screening*</u>

    133.    Defendant Schippert also conducted Ms. Rogers' initial medical screening on November 18, 2022.

    134.    Defendant Schippert noted in several places that Turn Key had received Ms. Rogers' recent medical records from BCJ.

    135.    Specifically, Turn Key officials responsible for the care and treatment of Ms. Rogers at the WCJ had records of Ms. Rogers' 2022 diagnoses of DVT and thrombosis (blood clots), her recent hospitalizations, and her prescription for the anticoagulant, Xarelto.

    136.    Ms. Rogers also repeatedly reported her blood clots during her intake screenings.

    137.    Defendant Schippert made the following note in the intake medical screening record: **"[patient] reported that she has 7 blood clots in her [left leg] with unknown cause. [Patient] reported that she was diagnosed at Boulder County Jail."**

    138.    During intake, Defendant Schippert contacted Turn Key Nurse Practitioner Defendant Teresa Sipola and verified Ms. Rogers' need for a Xarelto prescription for blood clots.

    139.    Defendant Schippert recorded that he reviewed the paperwork from BCJ regarding Ms. Rogers' need for the medication.

    140.    **Defendant Schippert noted that Ms. Rogers needed to be placed in the chronic care clinic for "clotting to [left leg]."**

| | | | | | |
|---|---|---|---|---|---|
| | | | aisability? | | |
| IN202210468 | Intake Screening - Medical | Other comments or physical findings not covered on this questionnaire? | Pt reported that she has 7 blood clots in her LLE with unknown cause. Pt reported that she was diagnosed at BOULDER COUNTY JAIL. | Schippert, Jayme | 11-18-2022 11:50 am |
| IN202210468 | Intake Screening - Medical | Are any of the following applicable to the patient? | N/A | Schippert, Jayme | 11-18-2022 11:50 am |
| IN202210468 | Intake Screening - Medical | Recommended housing based on medical/mental health evaluation: | Other (Note Reason) (BB d/t BMI Dental soft diet ) | Schippert, Jayme | 11-18-2022 11:50 am |
| IN202210468 | Intake Screening - Medical | Continuity of Care Plan: | Chronic Care Clinic (Clotting to LLE ) | Schippert, Jayme | 11-18-2022 11:50 am |

141.    In other words, Defendant Schippert identified the need for Ms. Rogers' to be placed on a chronic care treatment plan and protocol where she would be seen regularly for her blood clots and have her condition routinely monitored by Turn Key staff.

142.    Chronic care is a classification for patients who have ongoing health concerns that require regularly scheduled appointments or treatment.  Individuals in a chronic care clinic are seen on a schedule dictated by an individual treatment plan that is completed at the start of their incarceration.  Inmates are generally not charged for chronic care appointments and those appointments are documented in the health record.

143.    Under the standard of care, individuals with blood clots should be placed in a chronic care treatment program and receiving regular care and attention to their condition.

144.    But Defendant Schippert did not institute chronic care protocols for Ms. Rogers, did not enter Ms. Rogers into the chronic care system, nor did he schedule her to be seen for regular chronic care appointments at any point during her six-week incarceration.

145.    Moreover, Defendant Sipola also failed to institute chronic care protocols for Ms. Rogers at any point, failed to enter Ms. Rogers into the chronic care system, and failed to schedule her to be seen for regular chronic care appointments.

146.     Thus, Ms. Rogers was never seen in chronic care clinic for her blood clots, as she should have been for her condition because Defendants Schippert and Sipola failed in their duties to put her in chronic care treatment.

147.     Thus, as of her November 18, 2022 intake screenings, Turn Key staff – including Defendants Juba, Sipola, and Schippert, – were aware that Ms. Rogers was prescribed Xarelto to prevent deadly blood clots.

148.     The information from intake was readily available for the medical officials responsible for taking care of Ms. Rogers in 2022-23, including Defendants Juba, Sipola, and Schippert, and should have been referred to when treating her.

149.     Defendants Juba, Sipola, and Schippert were all made aware of Ms. Rogers' DVT/blood clots during her initial intake in November 2022 and all also failed to add her condition to her master conditions/problems list.

150.     A patient problem list is a critical document in any health record that allows all medical staff working with a patient the ability to see the main diagnoses and concerns for an individual, including all of their chronic care or life-threatening health issues, to ensure that all aware of the most important facts about an individual.

151.     Under a reasonable standard of care, Ms. Rogers' blood clotting should have been recorded on her problems list.

152.     These failures contributed to Ms. Rogers' condition going untreated for weeks and ultimately leading to her death.

**F.     Ms. Rogers Never Received Medication for her Blood Clots Because the Individual Defendants Failed to Follow the Standard of Care and Turn Key Policies**

153.    Turn Key medical records show that they documented Ms. Rogers as having "refused" her Xarelto medication - the lifesaving prescription to treat and prevent her blood clots - starting the first day in WCJ after her intake, on November 19, 2022.[2]

154.    Ms. Rogers' medication administration record ("MAR") shows that in addition to the fact that she was not receiving her anticoagulant, she was also not receiving many doses of the medication prescribed to treat her mental health conditions, Cymbalta.

155.    Medication refusal and non-adherence is a common phenomenon for individuals who struggle with mental health issues, and some people with these conditions have symptomology that leads them to lack trust and experience deep paranoia regarding medical treatment and medical officials.

156.    Not walking to the medication cart to receive medication is not "refusal" of medication.

157.    When an incarcerated individual refuses medication, a medical appointment, or other treatment, Turn Key policy and medical standards of care mandate that a medication refusal form is completed, and the patient is counseled on the risks associated with refusal of treatment.

158.    Medical officials are supposed to inquire about a patient who does not take their medications to understand why and to inquire about whether alternative treatment is available to meet their medical needs.

---

[2] Ms. Rogers' medical records state she "refused" some of her medications.  However, other records indicate these are not actual refusals and that the medication itself may not have been available.  Thus, on information and belief, Ms. Rogers was not "refusing" her medications, she was not receiving them.

159.     The medication refusal form process ensures and documents that the patient is informed about the potential risks of refusing treatment and that their decision to refuse is clearly stated and acknowledged by both the patient and healthcare provider, and that refusals can be tracked and reviewed.

160.     The medication refusal form requires the following information: 1) what they are refusing, 2) why they are refusing, and 3) that they have been counseled on the potential consequences of refusal, and 4) what those consequences could be.  If the patient refuses to sign the refusal form, at least one witness signature (and sometimes two, depending on the facility's policy) are required instead.

161.     Turn Key's refusal of treatment forms also include the following statements that medical professionals attest to if they sign on behalf of a patient who will not sign the form: "during the clinical interview which included counseling and education, the qualified healthcare professional has given me the opportunity to ask questions and has answered my questions;" and "I certify that I am of sound mind and have read, or had read to me, and fully understand the above information concerning my refusal to accept treatment/evaluation and have had an opportunity to ask questions before I affix my signature."

162.     The process of counseling an individual who refused medication or treatment and then appropriately documenting the refusal both on this form and in the MAR requires the medical professional responsible for medication administration to take additional time beyond their basic med cart duties and can create a strain on operations if there is not sufficient staffing.

163.     Turn Key policy at the WCJ and medical standards of care mandated that **after three refusals medical staff had to intervene and set an appointment with a Turn Key**

**provider to discuss the refusals.** This intervention and appointment are called "medication compliance counseling."

164. Indeed, Turn Key Medical Regional Manager, Heather Atchley, told law enforcement who would later investigate Ms. Rogers' death that, "a patient isn't allowed to refuse [medication] until they die."

165. But Ms. Rogers' death would prove otherwise.

166. According to Turn Key records, Ms. Rogers "refused" her Xarelto for 44 days straight - every single day from November 19, 2022 until she died from her untreated blood clots on January 2, 2023.

167. Ms. Rogers did not receive one dose of Xarelto during her entire six-week incarceration at the WCJ.

168. She was never provided any appointment or counseling by any Turn Key official regarding the fact that she hadn't taken any of her medication, including any attempt to consider alternative treatments.

169. Ms. Rogers also "refused" or went without her mental health medications for the majority of the time she was at the WCJ. This undoubtedly impacted her ability to make rational decisions about her medical choices.

170. No Turn Key medical personnel ever intervened, provided medication compliance counseling, or even met with Ms. Rogers to discuss why she was "refusing" medications, including Defendants Juba, Schippert, and Sipola.

171. Specifically, the following Turn Key staffers repeatedly noted Ms. Rogers' "refusal" of medication (or instances in which she otherwise did not receive her medication) and

failed to intervene or schedule medication compliance counseling in violation of policy: Defendant Schippert, Kristin Sherwen, Lynda Reddick, Lillian Harbor, Janna Bostwick, Andrew Ellquist, Kaitlyn Williams, Jordan Anderson, Kaila Burson-Bridges, Myron Nass, Cornelius Blevins, Theresa Crain, and Kimberly Rosati.

172.    Moreover, Turn Key staff responsible for medication administration (including those individuals listed *supra*) utterly failed in their duties to conduct refusal of medication counseling and documentation for Ms. Rogers.

173.    There are approximately 37 refusal of treatment forms in Ms. Rogers' medical record during her November 2022-January 2023 incarceration.

174.    Some medical refusal forms state that Ms. Rogers "refused" her medications, but a majority merely state she was "not present" to receive the medication or "did not come to med cart."

175.    Obviously, refusing medication is different from failing to show up for medication administration.

176.    If an inmate is unable to come to the medication cart, they should not be denied medication.

177.    Moreover, when Ms. Rogers did not get her medicine because she was not present at the medication cart, she was not counseled on the risks of skipping medication nor could Turn Key staff appropriately inquire about why she was "refusing" medication, so the refusal of treatment procedure was not done on those numerous occasions.

178. Indeed, many of the forms state "unable to educate," where the risks counseled are supposed to be documented, confirming there was no conversation or counseling provided to Ms. Rogers (see below).



179. None of these forms had an appropriately documented "reason for refusal."  Most forms were left blank for this portion, indicating that no conversations took place regarding why Ms. Rogers was allegedly "refusing" to take her critical medications.

180. 37 forms stated the "reason for refusal" was "right to refuse."  While patients do indeed have the right to refuse, that is insufficient documentation for what a patient is refusing and below the standard of care.

181. Only two of these forms have Ms. Rogers' signature; more than thirty did not have her signature.

182. Several of the refusal of treatment forms appeared to be pre-printed in advance to allow for even quicker execution, which is a blatant violation of the standard of care (and likely Turn Key policies) which requires the documentation to reflect the specific refusal, reasons for

refusal, and counseling that occurred.  It appears that the Turn Key officials' signatures were also pre-printed on the forms (see below).



183.    These refusal forms were also recklessly signed by Turn Key staff because they were signed despite the fact that the individuals did not perform any "clinical interview which included counseling and education" described on the form, nor did they give Ms. Rogers the opportunity to ask questions – especially where they explicitly note that medication was not provided merely because she did not show up to the med cart.

184.    The six weeks of "refusals" documented in Ms. Rogers' medical record shows that Turn Key staff were systematically failing to document or handle "refusals" appropriately and instead taking significant short cuts to minimize the time and effort required to handle a patient who needed more assistance with medication administration.

185.    This is undoubtedly a cost and time-saving measure by Turn Key staff that was

acceptable and normal given that at least 10 different staff members handled their medical

documentation and counseling obligations in this way over the course of many weeks.

**G.    Defendants and Turn Key Staff Were Aware of Ms. Rogers' Deteriorating
Condition and Ongoing Failure to Be Treated for Her Serious Conditions**

186.    On November 21, 2022, four days after she was booked into the WCJ, Ms. Rogers

requested to be seen for her mental health issues.  She again pleaded for mental health

medications.

187.    Defendant Psychotherapist Juba performed a psych medication review and Ms.

Rogers told her, "I have depression.  I need back on my meds."  Ms. Rogers also reiterated – and

Juba documented under "medical concerns"– that she had blood clots in her leg and that she had

notified medical of the condition.

188.    According to medical records, Defendant Juba didn't order Ms. Rogers' Cymbalta

at this point, it wasn't ordered until several days later after another NP saw her.

189.    On November 26, 2022, Turn Key RN Jane Schoenecker saw Ms. Rogers for her

initial medical assessment and exhibited the same deliberate indifference to Ms. Rogers'

wellbeing as other providers had.

190.    By this time, Ms. Rogers had already begun to "refuse" her medications and was

showing signs of emotional decline.

191.    Indeed, by November 26, 2022, Ms. Rogers more than met the three-refusal

threshold for medication compliance counseling.  But Defendant Schoenecker failed to provide

such counseling.

192.    Defendant Schoenecker falsely recorded that Ms. Rogers had never been hospitalized or received counseling for a mental health condition (she had) and that Ms. Rogers have never "seriously hurt [herself] intentionally or tried to commit suicide" (she had – repeatedly).

193.    During this initial exam, Schoenecker made no acknowledgement or record of Ms. Rogers' recent blood clots instead documenting that Ms. Rogers' extremities, heart, and all other physical aspects were "unremarkable."

194.    Schoenecker also failed to add DVT/blood clots to Ms. Rogers' problem list and failed to put her in the chronic care clinic for regular treatment and monitoring of her condition.

195.    Also on November 26, 2022, Ms. Rogers made another request to see a mental health provider because she had still not received her mental health medication.

196.    NP Zander saw Ms. Rogers on this date, and he noted she was "dysphoric/sad" and recorded that her symptoms were of moderate severity.

197.    NP Zander prescribed her two psychotropic medications and noted she "seeks to restart [the meds] during jail stay."

198.    On this date, NP Zander created an alert in Ms. Rogers' medical record that she was "special needs – mental health."

199.    This alert would be an indication to the medical professionals reviewing her record and taking care of her that she was experiencing mental health struggles and prescribed necessary psych medications.

200.     Ms. Rogers' medical records contain information that suggests Turn Key officials did not have her psychological medication, Cymbalta, for some period of time during the initial few weeks of her incarceration.

201.     Ms. Rogers' Cymbalta was not recorded on her MAR until November 28, 2022 – 10 days after she arrived at the WCJ.

202.     Therefore, on information and belief, for some amount of time, Turn Key officials falsely documented that Ms. Rogers "refused" her medication when in fact the facility did not have her psych medication.

    a.  *Early December 2022 – Ms. Rogers Complains About Blood Clot Symptoms, Receives No Care*

203.     On December 6, 2022, the Estate of Amy Cross filed a civil rights lawsuit against Turn Key, Weld County, and Defendant Sipola (*inter alia*) regarding Ms. Cross' in-custody death at the WCJ.  (Further information on this suit *infra*)

204.     On December 8, 2022—about three weeks before her death—Ms. Rogers submitted an inmate medical request form with the following message: **"Can I please be seen by medical I'm having bad pains through my right leg and back where it hurts to move and having issues walking."**

205.     Internal Turn Key documents show that the appointment description was noted as "[inmate] requesting to see provider for leg pains."

206.     On December 8, 2022, Defendant Sipola saw Ms. Rogers' complaint of leg pains and request for appointment.

207.    Internal Turn Key documents show that on the same date, Defendant Sipola rescheduled Ms. Rogers to be seen five days later on December 13, 2022 instead of on December 8, 2022.

208.    There was no reason given for the rescheduling of the appointment.

209.    Medical standards of care dictate that an individual with a history of blood clots in their leg complaining of leg pains should be seen as quickly as possible, not five days later.

210.    And a report of leg pain in a patient with blood clots who had been without their medication for weeks warrants an urgent appointment that day or the next under the standard of care.

211.    Moreover, Defendant Sipola would have seen on December 8, 2022, that Ms. Rogers had not received her blood clot and mental health medications for weeks and should have promptly scheduled Ms. Rogers for medication compliance counseling.

212.    Also on December 8, WCSO Pod Deputy Moore requested that Turn Key medical staff perform a welfare check on Ms. Rogers.

213.    On information and belief, this request was made because Ms. Rogers' mental and physical health was noticeably worsening such that custody staff were concerned, including the fact that Ms. Rogers was in pain and having problems walking.

214.    Defendant Juba wrote that Ms. Rogers declined to see her, saying she was "all good."

215.    But Defendant Juba also reviewed Ms. Rogers' medical chart and documented in an encounter note that Ms. Rogers was being non-compliant with her medications.

216.    Despite the fact that the medical protocol flowsheet indicates it should be done when a patient is not compliant with medications, Juba inexplicably did not make a referral to Ms. Rogers' provider on December 8, 2022, when she documented the medication non-compliance.

217.    Moreover, despite noting the non-compliance, Defendant Juba did not conduct medication compliance counseling with Ms. Rogers nor did she set an appointment for Ms. Rogers to do such counseling with another provider.

218.    Defendant Juba ignored the fact that Ms. Rogers had "refused" and thus not received almost a month worth of critical medications for her mental and medical well-being.

219.    On December 13, 2022, when Ms. Rogers was called down to the clinic for her appointment regarding her leg pains, she allegedly "refused."  A refusal form was again haphazardly filled out.  The reason was only noted merely as "right to refuse," and there was nothing filled in for the "risks attendant" to the refusal portion.

220.    No Turn Key official consulted with Ms. Rogers to discover why she had "refused" her appointment for her leg pain, including whether pain was precluding her from attending the visit.

221.    Ms. Rogers continued to be ignored by Turn Key staff.

## H.    Defendant Sipola Pushes Back a Time-Sensitive Appointment With Ms. Rogers—Now Weeks Without Treatment

222.    On information and belief, on or around December 18, 2022, Ms. Rogers sent a kite (message) to Turn Key medical staff complaining about worsening leg pain and her blood clots.

223.    On information and believe, Defendant Sipola was aware of this kite as her provider.

224.    On December 18, 2022, Lynda Reddick wrote Ms. Rogers the following response: "You have your blood thinner available to you at the evening med pass. You need to get in line to get your medications."

| Patient Communication Note: | You have your blood thinner available to you at the evening med pass. You need to get in line to get your medications. | Reddick, Lynda | 12-18-2022 3:36 pm |
|---|---|---|---|

225.    Thus, on December 18, 2022, Reddick reviewed Ms. Rogers' medication administration records and was aware of her weeks of medication "refusals," and failed to schedule her for the required medication compliance counseling.

226.    Instead, Reddick chose to chastise Ms. Rogers for the fact she was not walking to med line for her medications.

227.    But ten days before this, Ms. Rogers had sent a medical kite – that was recorded in her medical chart – complaining that her pain made it hurt to move, and she was having trouble walking.

228.    Ms. Rogers' MAR reflects that she "refused" every single dose of Xarelto while incarcerated, so at this point it would have been about a month worth of missed medication to treat and prevent blood clots.

229.    Ms. Rogers' blood clots and mental health continued to worsen, and she was still unmedicated.

230.    On December 29, 2022, around 3:00 am, Turn Key nurse Erica Alcaraz scheduled Defendant Sipola to do a chart review for Ms. Rogers noting, **"[patient] has been refusing**

**Xarelto.  Would you like to see in clinic?"**  Alcaraz indicated this was the highest appointment priority and it was scheduled for the same day.

231.    Internal Turn Key documents show Defendant Sipola reviewed this request from Alcaraz that afternoon.

232.    Instead of having an appointment with Ms. Rogers on December 29, 2022, to address the fact that she was unmedicated for her life-threatening blood clots for six weeks, Defendant Sipola rescheduled the appointment.

233.    **Defendant Sipola recklessly rescheduled the appointment for 6 days later, on January 4, 2023.**  No reason was given for the reschedule.

234.    Thus, on December 29, 2022, Defendant Sipola was aware that Ms. Rogers had been without her anticoagulation medication for the past six weeks despite her recorded history of blood clots and DVT in her leg.

235.    Sipola also was aware that Ms. Rogers had been complaining of leg pain and problems walking weeks prior without being seen by anyone or receiving any treatment.

236.    Nonetheless, Defendant Sipola did not schedule Ms. Rogers to be seen immediately, as the standard of care would dictate.

237.    Incredibly, Defendant Sipola moved Ms. Rogers' appointment back six days.

238.    The internal documents show that Defendant Sipola revisited the appointment request on December 31, 2022, and it was again noted as rescheduled.

239.    Thus, on information and belief, Defendant Sipola rescheduled this appointment twice.

240.    Predictably, Ms. Rogers continued to not receive her medication to prevent and treat her blood clots during this time.

**I.    After Being Without Treatment for Six Weeks, and While Awaiting Her Rescheduled Appointment, Ms. Rogers Painfully Suffered and Died from Untreated Blood Clots on January 2, 2023**

241.    On January 2, 2023, around 6:30 am, as she was walking back to her bunk from the bathroom, Ms. Rogers collapsed to the floor in her WCJ unit.

242.    Two WCSO deputies came to her aid and assisted her in getting back to her bunk.

243.    Ms. Rogers complained that she was dizzy and was slow to respond. Ms. Rogers told the deputies that her chest hurt, and that she was struggling to breath.

244.    Turn Key staff were called via radio by WCJ custody staff because Ms. Rogers was complaining of chest pains. WCSO deputies requested Turn Key medical staff come evaluate Ms. Rogers. But Turn Key medical staff instead requested the WCSO transport Ms. Rogers to medical staff and declined when a WCSO deputy requested they come check Ms. Rogers before they moved her, saying to just bring Ms. Rogers over.

245.    WCSO deputies brought a wheelchair to Ms. Rogers' bunk to transport her to medical. Ms. Rogers was hot and sweaty and had started to lose her color and her lips had begun to turn blue. She could not get into the wheelchair.

246.    Ms. Rogers' condition rapidly declined after this. She became unresponsive, going in and out of consciousness, and slumped back into her bunk. Ms. Rogers was placed on a mattress on the floor in the unit.

247.    Finally, Turn Key staff, including Defendant Schippert, came to Ms. Rogers' bunk to examine her,

248.    Ms. Rogers' oxygen was plummeting and inmates in the WCJ can be heard in videos of this event yelling to WCSO and Turn Key staff that Ms. Rogers had blood clots and needed emergency attention.

249.    Eventually, fire and emergency personnel arrived to the WCJ and took Ms. Rogers out of the jail.  She was pronounced dead shortly thereafter.

250.    Ms. Rogers' autopsy revealed that she died of pulmonary embolism.

251.    A pulmonary embolism is a blockage in your pulmonary arteries, the blood vessels that send blood to your lungs.  It usually happens when a blood clot in the deep veins in a person's leg breaks off and travels to their lungs.

252.    If DVT/blood clots are not treated, clots can break free and cause a pulmonary embolism.

253.    In other words, Ms. Rogers died from her untreated blood clots.

**J.    The County Continues to Disregard Inmate Health and Wellbeing**

254.    Turn Key terminated its contract with the County early (i.e. before it ended) later in 2023.

255.    After Turn Key suddenly terminated its contract with the County early, the County initiated an "emergency bid" procedure waiving various requirements to quickly hire a new private medical contractor.

256.    Drafts of the 2023 contract with its new medical provider, Wellpath (another notoriously insufficient provider itself the focus of vast amounts of litigation for inadequate care), show that the County allowed Wellpath to reject various contract provisions which would

have allowed the County to enforce staffing requirements/levels.   And, nonetheless, the County

hired Wellpath to care for its inmates.

**K.      Turn Key Has a Pattern and Practice of Understaffing, Inadequate Care, and
Minimizing/Disregarding Inmates' Medical Complaints**

257.     At a all times relevant hereto, the County contracted with Turn Key to provide

medical care and services to detainees and inmates at the Weld County Jail.

258.     Defendants Turn Key and the County maintain a custom, practice, and policy of

disregarding and minimizing inmates' medical complaints, failing to conduct sufficient

medication administration and compliance monitoring, failing to timely send patients to

providers and provide them chronic care, understaffing, and using nurses to practice medicine

recklessly outside their scope in order to save money and increase profits.

259.     Each of the Individual Defendants violated Ms. Rogers' Fourteenth Amendment

right to be free from deliberate indifference to her medical needs by disregarding her mental

health condition, symptoms, and weeks of lack of treatment; and failing to refer her for higher

level evaluation, medication counseling, and treatment despite knowing that failing to do so put

her at significant risk of serious illness or death.   Each Individual Defendant participated in

delaying Ms. Rogers' necessary treatment.

260.     Turn Key had financial incentives not to medicate patients, not to schedule

patients for chronic care or provider visits, not to send individuals for specialist care, not to take

time to counsel patients on medication compliance, and to delay care wherever possible.

261.     Turn Key highlighted in is 2019 bid to the County for the medical provider

contract that it would reduce costs by reducing offsite care, and assumed financial responsibility

for the costs associated with laboratory services and all medications administered (with certain limited exceptions not applicable here), when it won the contract.

262.    Before the County awarded Turn Key its contract, there was a well-known widespread pattern and practice of deliberately indifferent medical care at Turn Key facilities.

263.    Prior to Ms. Rogers' death, there was a well-known widespread pattern and practice of deliberately indifferent medical care at facilities that used Turn Key.  In the several years preceding the initial contract with the County, Turn Key was named as a defendant in at least fifty lawsuits alleging inadequate medical care in Oklahoma and Arkansas alone, and in at least a hundred lawsuits nation-wide alleging they provided inadequate medical care to inmates. This includes the following examples:

a)  In 2009, a 21-year-old Cleveland County Jail inmate slipped into a coma and suffered a heart attack that put her in a vegetative state for several years after ESW Correctional Healthcare (a previous iteration of Turn Key Health Clinics, LLC) ignored her repeated requests for medication attention and serious symptoms after she experienced a traumatic brain injury at the jail.  Lacee Marez repeatedly asked for medical treatment, was vomiting and urinating on herself, and laid lethargic in her bed for three days before she fell into the coma; she eventually died years later. Turn Key settled the case in 2014.

b)  In 2011, 36-year-old Curtis Pruett died of a heart attack while incarcerated at Cleveland County Jail after Turn Key staff ignored his repeated requests for emergency medical attention.  Mr. Pruett told medical staff that he had high blood pressure and was having severe chest pain.  The medical staff accused him of faking

his condition and failed to assess or send him for emergency care. Turn Key settled a lawsuit related to the incident in 2014.

c) In 2014, while detained at the Cleveland County Detention Center and under the care of Turn Key, Robert Autry was found unconscious in his cell from what was later found to be a severe brain injury resulting from a serious bacterial infection in his brain from of an untreated sinus infection he got at the jail. Mr. Autry and his family repeatedly requested Turn Key provide prompt medical attention because a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections, but those pleas went unheeded. As a result of the delay, Mr. Autry needed emergency brain surgery and required a feeding tube, tracheal tube, and a cranial monitoring probe and is not likely to ever return to an independent state.

d) In 2016, Turn Key medical staff failed to intervene in an Oklahoma jail while an incarcerated patient, Anthony Huff, who was experiencing delusions and hallucinations, was strapped in a restraint chair for more than 55 hours. Mr. Huff ultimately died in the chair and two Turn Key nurses and others were each charged with felony second-degree Manslaughter. Turn Key contributed a confidential amount to a $12.5 million settlement in a case on the incident.

e) In June 2016, Canadian County Detention Center inmate Anthony Kade Davis died after he was found naked, unconscious, and covered in his own waste in a cell while under the care of Turn Key medical staff. Leading up to his death, Mr. Davis was screaming, shouting that he was in pain, and pleading for assistance. He was known

to be ill and experiencing serious and dangerous symptoms including black, foul-smelling feces that had the appearance of coffee grounds. Despite knowing of these serious symptoms, Turn Key medical staff did not assess Mr. Davis or perform any diagnostic tests to determine the cause.  A lawsuit was regarding his death was filed in 2017.

f)  In 2016, Muskogee County Jail inmate Michael Edwin Smith became permanently paralyzed when Turn Key staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling.  Mr. Smith had cancer, which spread to his spine, causing a dangerous spinal compression – a condition that can cause permanent paralysis if untreated. For a week before he could bond out of the jail, Mr. Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own - all under the care of Turn Key officials. He lay in his own urine and feces because the jail staff accused Mr. Smith of faking paralysis and refused to help him. Turn Key settled a lawsuit regarding the incident in 2018.

g)  In 2016, after Greene County Jail inmate Andrew Bowen was severely beaten, he was bleeding from the head, unconscious, and exhibiting agonal breathing/loud snoring (an indicator of severe head and brain injury).  A Turn Key nurse attempted to awaken Mr. Bowen without success. Despite recognizing that Mr. Bowen needed emergency medical care, and that she was not equipped with the necessary equipment to assist Mr. Bowen in this medical emergency, the nurse did not provide any timely assessment or treatment or arrange for Mr. Bowen's transfer.  Turn Key

officials waited to call an ambulance until after jail employees cleaned the blood off

him, changed him out of his blood-soaked clothes, and booked him into the jail.

h) In 2016, In 2016, Creek County Jail inmate Russell Ted Foutch died after he was

observed foaming at the mouth and coughing up blood. He complained of shortness

of breath, lost consciousness multiple times in front of jail staff, and other inmates

and his family pled for him to get reatment.  Sadly, he slowly died in his cell from

complications related to pneumonia without ever receiving the medically appropriate

treatment and care from the Turn Key officials that he obviously needed to save his

life.

i) In 2016, Muskogee County Jail James Buchanan informed Turn Key staff at booking

that he had been in a car accident and was suffering from broken ribs, a collapsed

lung, and neck problems, but he was just placed in general population.  Over the next

ten days, Mr. Buchanan became quadriplegic one limb at a time because a cervical

epidural abscess was allowed to fester.  Turn Key medical staff were aware that Mr.

Buchanan was experiencing sudden and expanding paralysis but did nothing, even

after he lost the ability to feed and hydrate himself.  It was only when Mr. Buchanan

was found lying in a puddle of his own urine, complaining of terrible pain nearly 11

days after the initial onset of his symptoms that he was finally sent to the hospital.

Mr. Buchanan remained paralyzed and permanently disabled despite spinal surgery.

j) In 2016, Pulaski County Jail inmate 41-year-old Sharon Lavette Alexander died

when her asthma inhaler was taken from her at intake and she suffered from acute

exacerbation of asthma.  A federal wrongful death lawsuit was settled in 2019, Turn

Key paid $375,000 to the family.

k) In 2017, Wesley Prince was booked into the David L. Moss Criminal Justice Center,

a Turn Key facility, after he was arrested while disoriented and wandering as a result

of acute symptoms associated with renal failure and the onset of respiratory failure

due to pneumonia.  Over the next week Mr. Prince repeatedly asked for medical

attention and became more and more disoriented over a week but Turn Key medical

staff did not perform any tests to determine the cause of Mr. Prince's disorientation,

instead, medical staff put Mr. Prince on an opiate withdrawal protocol without

performing any testing, hands-on assessment, or diagnosis.  After over a week, Turn

Key medical staff diagnosed Mr. Prince with pneumonia and eventually sent him out

to the hospital. The emergency department providers determined that Mr. Prince was

suffering from renal and respiratory failure, intubated him, and admitted him to the

intensive care unit in critical condition where he underwent hemodialysis at least

once a day for several days. A lawsuit arising from the incident was filed in 2018.

l) In 2017, Pulaski County Regional Detention Facility inmate Trillus Smith died in the

from acute pneumonia and dehydration. In the two weeks preceding her death, Turn

Key medical staff observed that Ms. Smith was becoming less oriented to reality,

unable to communicate, lethargic, not eating or drinking, and that her eyes were

rolling in her head. Several nurses collected dangerously abnormal vital signs

including critically low blood pressures on February 13th and 14th. Ms. Smith's

blood labs also indicated a life-threatening condition. Despite these critically

abnormal vital signs and values, Ms. Smith was never assessed by a higher-level

caregiver or transported to the hospital. Rather, she was left alone in her cell to die.

m) In 2017, Creek County Detention Center, a Turn Key facility, detainee Ronald

Garland was booked in to the jail.  More than 12 hours later a Turn Key nurse noted

that a jail staff member alerted her Mr. Garland was "acting weird" in the housing

unit. She assessed Mr. Garland shortly thereafter and noted he denied being under

the influence of any drugs or alcohol, that he was unable to answer orientation

questions, he was moaning and yelling, could not focus or sit still. She charted his

vital signs as a range and noted that Mr. Garland needed a medical assessment

ASAP as he was potentially detoxing. Two hours later, the same nurse noted that

Mr. Garland was confused, experiencing active visual hallucinations, but non

combative.  Despite his obviously worsening condition, this nurse did not take any

steps to provide Mr. Garland with care or determine the cause of his symptoms.

Later that night, deputies moved Mr. Garland to a restraint chair and abused him.  At

the hospital, Mr. Garland was diagnosed with an anoxic brain injury from which he

did not recover and subsequently passed away.  A lawsuit regarding Mr. Garland's

death settled in 2021 when Creek County paid Mr. Garland's Estate $750,000 and

Turn Key paid an additional confidential amount.  An Order denying Turn Key's

Motion to Dismiss found that the allegations against the Turn Key official

sufficiently alleged deliberate indifference because they didn't take any steps to

provide Mr. Garland with any care despite the severe risk and despite actual

knowledge that his condition was worsening. *Bush v. Bowling*, No. 19-CV-00098-GKF-FHM, 2020 U.S. Dist. LEXIS 8495, at *16-17 (N.D. Okla. Jan. 17, 2020).

n) In 2017, Bryan County Detention Center (a Turn Key facility) inmate Rebecca Royston was booked into the without an intake medical screening even though deputies observed her being unsteady on her feet and believed her to be highly intoxicated. When a Turn Key nurse finally saw Ms. Royston, she charted that she was unable to obtain vital signs, unable to communicate with the patient, and occasionally Ms. Royston's eyes would open and roll back. Despite knowing she had banged her head on concrete and observing Ms. Royston's obviously emergent condition, the nurse did nothing to secure higher level care, leaving Ms. Royston to languish on the ground, rolling side to side in extraordinary pain, for more than four hours, at which time security staff made the decision to send Ms. Royston to the hospital. A CT scan revealed Ms. Royston had suffered intercranial hemorrhaging, and the delay in care caused permanent and irreversible damage. Turn Key settled a lawsuit arising from the incident in 2021.

o) In 2017, Tulsa County Jail inmate 25 year old Caleb Lee died as a result of a cardiopulmonary arrest after Turn Key medical staff at ignored his serious and worsening symptoms for days. Turn Key staff knew that Mr. Lee also had cardiac disease, hypertension, and was already experiencing withdrawal. Turn Key medical staff nonetheless canceled three follow up appointments and did not secure higher-level evaluation and treatment for Mr. Lee. Finally, the day before his death, detention officers moved Mr. Lee from his cell to the medical unit when he was

found lying on the floor complaining of chest pain.  He later died in hospital.  A lawsuit alleging Turn Key medical staff were deliberately indifferent to Mr. Lee's serious medical needs was settled in February 2022.

p) In 2016, Creek County Justice Center (a Turn Key facility) inmate Brenda Jean Sanders died after suffering for a month without adequate care from Turn Key staff. Turn Key staff noted that she had been suffering from diarrhea and her mental state had been rapidly declining for at least two to three weeks.  As her health obviously and swiftly deteriorated, medical personnel never provided Ms. Sanders any care, nor did they ever even obtain her medical history.  35 days after entering the jail, Turn Key staff finally had Ms. Sanders transported to the hospital after she had become fully incapacitated and was on the brink of death. At the hospital Ms. Sanders was diagnosed with "severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, coagulopathy, anemia, and thrombocytopenia." Ms. Sanders died the day after her admittance to the hospital. A lawsuit alleging Turn Key medical staff were deliberately indifferent is ongoing.

q) In 2018, F. Dewayne Beggs Detention Center inmate 35-year-old Marconia Lynn Kessee died within hours of being booked into the jail because despite obvious symptoms a Turn Key nurse did not recognize that Kessee was overdosing, instead accusing him of faking symptoms that included seizures. The nurse left Mr. Kessee alone in a cell, and within two hours, he was dead of an overdose. Turn Key settled the lawsuit arising from Mr. Kessee's death for a confidential amount in 2023.

r)  In 2018, Tulsa County Jail inmate Michelle Ann Caddell  tested positive for chlamydia about a month after booking. Reasonably trained medical professionals know that chlamydia significantly increases the likelihood that a person will develop cervical cancer.  Over several months, Ms. Cadell exhibited and repeatedly complained of myriad serious symptoms including continuous irregular vaginal discharge, hip and pelvic pain, heavy bleeding, anemia, elevated white blood cell count, heavy growth of E. Coli, and difficulty with bowel movements. But, in the face of these serious symptoms, Turn Key medical staff did not perform additional evaluation or diagnostics. Instead, Turn Key staff offered Ms. Caddell Tylenol and accused her of abusing the medical sick call system. Ms. Cadell continued to deteriorate over the next several months, to the awareness of Turn Key staff. A pap smear in early October revealed atypical squamous cells, but even then, Turn Key staff did not have Ms. Caddell immediately evaluated so she could receive treatment for what was very likely cancer. By October 30, Ms. Cadell began discharging tissue from her vagina in addition to blood.  A biopsy revealed Ms. Caddell had cervical cancer that had progressed to at least stage 3 and extensive necrosis. Hospital staff determined that she would need radiation and/or chemotherapy. Upon learning the severity of Ms. Caddell's diagnosis the county and Turn Key worked swiftly to release Ms. Caddell from custody so they would not incur the cost of her cancer treatment. Ms. Caddell fought the cancer for months, but eventually succumbed in 2020. A federal lawsuit arising from her death is ongoing.

s)  In 2018, Ottawa County Jail inmate Angela Yost died after six days of suffering
without medical attention from Turn Key staff.  Turn Key staff at the jail were well-
acquainted with Ms. Yost and were aware she had several serious medical
conditions, including that she had recently been hospitalized for a poorly-healing
wound, cellulitis, and DVT in her left leg. Still, she did not see a nurse and was not
provided any medications for the first three days she was at the jail, even as her
condition observably declined. During the first three days, Ms. Yost's pain in her left
leg increased and the wound began to secrete a yellow discharge and foul odor. She
struggled to move, laid on the floor, and complained that she needed to be seen by a
doctor and receive her medications. When Ms. Yost was finally assessed, the Turn
Key nurse did not refer Ms. Yost to a higher level of care, or even make a plan for
her to be seen by a doctor or NP, despite the fact that she had numerous and serious
co-morbidities, had not received any medications for three days, and obviously had
an active infection. Rather, the nurse informed a Nurse Practitioner of Ms. Yost's
condition, and despite the NP's awareness that Ms. Yost had an active infection and
serious comorbidities, she also did nothing. Ms. Yost continued to observably
deteriorate over the next three days. On the morning of October 30, she was helped
to the shower where she collapsed and was unresponsive. She was pronounced dead
17 minutes after she arrived at the emergency room. A lawsuit arising from her death
was filed in 2020.

t)  In 2018, Ottawa County Jail inmate Misty Bailey was experiencing severe chest pain
and elevated heart rate. She eventually started vomiting, could not keep down any

food or medications, and also began experiencing lower back pain and severe pain

when urinating. Despite being informed of these symptoms, Turn Key medical staff

refused to assess Ms. Bailey or send her to the hospital. For two days Ms. Bailey

continued to deteriorate, eventually experiencing a fever of 103 degrees and a

seizure, at which point detention staff informed Ms. Bailey she would be taken to the

hospital only if she agreed to be released on her own recognizance and assume

financial responsibility for her medical care. At the hospital Ms. Bailey was

diagnosed with a bacterial UTI infection that had progressed to her kidney. *See*

*Bailey v. Turn Key Health Clinics, LLC*, No. 20- CV-0561-CVE-SH, 2021 U.S. Dist.

LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021) (finding adequate allegations

of Turn Key pattern/practice).

u)  In 2020, inmate Lesley Sara Hendrix died after repeated requests for medical

attention for nausea, severe pain, dizziness, and vomiting were disregarded and

denied. Ms. Hendrix developed a rash on her legs in early October, which she

reported to Turn Key medical personnel, but nothing was done to address this

condition.  A week before her death, she sought help from a Turn Key staffer told

Ms. Hendrix that they would not permit her to make an appointment orally and that

she would have to use a computer kiosk. The only kiosk Ms. Hendrix had access to

was broken, and no other means of scheduling an appointment were provided.  Her

condition worsened and eventually Ms. Hendrix collapsed and was finally

transported to the hospital. Upon her arrival Ms. Hendrix was in critical condition,

was in acute respiratory distress, metabolic acidosis and severe septic shock. During

the emergency medical assessment hospital staff found Ms. Hendrix had an
enormous black, bulging wound to her perineum, lower abdomen, buttocks, and
genitals caused by necrotizing fasciitis.  Ms. Hendrix died at the hospital.  A federal
lawsuit related to her death is ongoing.

v) In 2021, Sebastian County Jail (a Turn Key facility) inmate Larry Eugene Price, Jr. –
a man with an IQ below 55 - died of starvation and dehydration after a year in
solitary confinement.  Turn Key staff knew that Mr. Price was being kept in solitary
confinement due to his psychosis and that he was not consistently taking his
medications, but did not regularly check on him or make any effort to get him
transferred to a more appropriate facility, and never followed up after discontinuing
Mr. Price's antipsychotic medication roughly nine months before his death. Because
of his unaddressed mental health needs, Mr. Price barely ate or drank, as custody and
Turn Key staff were aware.  Instead, they ignored his life-threatening condition
altogether and simply watched him deteriorate.  He eventually died lying in a pool of
standing water and urine.  His family reached a multi-million-dollar settlement with
Turn Key and others in 2024.

w) In 2022, Union County Jail inmate Eusebio Castillo Rodriguez died a few days after
he was neglected in the jail during potentially life threatening alcohol withdrawal.
Turn Key did not treat his symptoms or send him to the hospital for more than five
days until he was unresponsive.  Once Mr. Rodriguez was released from the jail's
custody, and neither the jail nor Turn Key was financially responsible for his care, an
ambulance was finally called for Mr. Rodriguez. The hospital flight for lifed him to a

hospital where he died days later.  A federal lawsuit concerning Mr. Rodriguez's

death is ongoing.

264.    Turn Key also has a history of inadequate medical care in Colorado facilities.

265.    In 2021, a Weld County Jail inmate, Amy Cross, tragically lost her life in while

under the care of Turn Key.  Ms. Cross died of methamphetamine after Turn Key medical staff

openly disregarded her struggling for over seven hours with chest pain, shaking, erratic behavior,

high heart rate, abnormal breathing, feverish, seizing, fingers turning blue, and foaming at the

mouth.  Despite knowing of these obviously emergent symptoms and even after WCSO deputies

called them repeatedly with concerns about Ms. Cross and after declaring two medical

emergencies, Turn Key staff still recklessly disregarded her symptoms as fake.  They pre-

determined not to hospitalize Ms. Cross.  Sadly, Ms. Cross died in the WCJ.  A federal lawsuit

arising from her death is ongoing – a motion to dismiss was denied.

266.    On November 3, 2022, 22-year-old Avery James Borkovec died in the Boulder

County Jail from staph infection, endocarditis, and sepsis – easily treatable infections that would

not have killed him had he received proper and timely medical attention and treatment.  Before

he was transferred to the jail where he ultimately died, Turn Key officials failed to adequately

treat Mr. Borkovec and failed to convey the severity of his medical condition to his new facility.

The Estate of Brokovec filed suit against Turn Key and its staff, and others, in 2024.  This suit

also challenges Turn Key's "widespread pattern, practice, and custom of failing to properly treat

inmates with serious medical needs," "alarming deficiencies in screening, monitoring, and the

adequate delivery of medical care," that "were identified and otherwise known and obvious to

Turn Key for years prior to Mr. Borkovec's death," "in part because of impermissible profit driven considerations affecting hospitalizations, diagnostic testing, and staffing."

267.    Turn Key's unconstitutional customs, practices, and policies of (1) disregarding and minimizing inmates' medical complaints; (2) delaying or denying indicated testing and treatment, including medications; (3) understaffing; (4) using nurses to practice medicine recklessly outside their scope; or (5) failing to provide necessary follow up care (like chronic care and medication compliance counseling) to patients.

**L.    Ms. Rogers' Family Continues to Mourn Their Loss**

268.    Ms. Rogers is survived by her daughter, Anna Peterman, as well as her grandchildren and many other friends and family members.

269.    Although Ms. Rogers, like any person, had her own personal challenges, she deeply loved her daughter and growing number of grandkids.  She had eternal warmth, love, and encouragement she shared with those around her.

270.    Ms. Rogers was fierce, strong, and creative.  She was an artist, highly passionate about life but even more passionate about love and family.  She provided Ms. Peterman the guidance and support that she needed when she was a young mother and raised Ms. Peterman to value family first and foremost.



*(Ms. Rogers, left, and Ms. Peterman, right)*

271.     Her friends and family miss her zest for celebrating the holidays and her
tenderness and love.  She will always be remembered for her lifelong commitment to provide
Ms. Peterman and her grandchildren with the support and childhood that she lacked as she grew
up.

272.     Ms. Peterman carries her spirit with her as she raises her own family with the
values and warmth instilled in her by her mother, Christina Rogers.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983
### Unconstitutional Medical Care
### (Plaintiff Estate against Defendants Juba, Schippert, and Sipola)

273.     The Estate incorporates by reference the foregoing paragraphs of this Complaint
as if set forth fully herein.

274.    The Estate brings this claim against Defendants Juba, Schippert, and Sipola

275.    Christina Rogers was a citizen of the United States and Defendants to this claim
are persons for the purposes of 42 U.S.C. § 1983.

276.    Ms. Rogers was a pre-trial detainee.

277.    As a pre-trial detainee, she was protected from deliberate indifference to her
known serious medical needs by the Fourteenth Amendment. To the extent her status was
considered a convicted inmate, Ms. Rogers was protected from deliberate indifference to her
known serious medical needs by the Eighth Amendment.

278.    The Individual Defendants, as private actors working in a jail, are not entitled to
qualified immunity.

279.    Each Individual Defendant to this claim, at all times relevant hereto, was acting
under color of state law.

280.    As a result of the allegations contained in this Complaint, Individual Defendants
are liable under 42 U.S.C. § 1983 for the violation of Mr. Rogers' constitutional rights by acting
with deliberate indifference to her serious medical needs and disregarding the excessive risks
associated with her life-threatening medical condition, despite being expressly aware of her
known serious medical needs and obvious need for the same.

281.    All of the Individual Defendants named in this Complaint personally participated
in the constitutional deprivations described herein.

282.    The acts or omissions of these Defendants were the legal and proximate cause of
Ms. Rogers' death and her Estate's losses and injuries.

283.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and other special damages, all in amounts to be proven at trial.

284.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, prejudgment interest and costs as allowable by federal law.

285.    Plaintiff is also entitled to punitive damages against these Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983**
**Unconstitutional Policies, Customs, and Training**
**(Plaintiff Estate against Defendants BOCC, Sheriff Reams, and Turn Key)**

286.    The Estate incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

287.    The Estate brings this claim against Defendants BOCC, Sheriff Reams (collectively, "Weld County Defendants") and Turn Key.

288.    Christina Rogers was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

289.    Ms. Rogers was a pre-trial detainee.

290.    As a pre-trial detainee, she was protected from deliberate indifference to her known serious medical needs by the Fourteenth Amendment.  To the extent her status was considered a convicted inmate, Ms. Rogers was protected from deliberate indifference to her known serious medical needs by the Eighth Amendment.

291.    Defendant Turn Key is liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which include customs and training.

292.    The Weld County Defendants are non-delegably liable for Turn Key's unconstitutional policies and practices.

293.    Moreover, the Weld County Defendants are also directly liable for their own deliberately indifferent policies and supervision that were moving forces in Ms. Rogers' constitutional injury - for its deliberately indifferent hiring and supervision of the medical contractor, and for its own ongoing toleration and/or ratification of the widespread pattern and practice of deliberate indifference within WCJ.

294.    Weld County through policy makers and final delegated decision-makers, ratified their employees and subordinates unconstitutional conduct by approving their decisions and the basis for them, including ongoing toleration of the known widespread culture of ignoring inmates' serious medical conditions, in part to save money.

295.    Turn Key had a widespread pattern, practice, and custom of failing to properly treat inmates with serious medical needs, often disregarding them as faked, purposeful or refusing treatment.  Alarming deficiencies in screening, monitoring, and the adequate delivery of medical care and medication administration were identified and otherwise known and obvious to Turn Key for years prior to Ms. Rogers' death. Despite this knowledge, Turn Key and its corporate officials chose not to rectify the problems, putting the lives of its incarcerated patients at risk, in part because of impermissible profit driven considerations affecting hospitalizations, chronic care treatment, medication administration, and staffing.

296.    Turn Key failed to adequately train personnel to recognize and respond to the serious medical needs of their patients, especially those with serious mental illnesses.  In the light of the duties assigned to health care workers, the need for more or different training and supervision of them was obvious, and the failure to do so by Turn Key was deliberately indifferent to the rights of incarcerated individuals.

297.    Defendant Turn Key ratified the unconstitutional conduct of its employees, agents, and/or subcontractors with regard to the unconstitutional conduct done to Ms. Rogers as they approved of the conduct and the basis for it.

298.    Defendants Weld County and Turn Key's unconstitutional acts and omissions were moving forces in the unconstitutional acts of the individual defendants and were the legal and proximate cause of Ms. Rogers' injuries and her Estate's losses.

299.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff Estate has suffered injuries and losses entitling it to recover its compensatory and special damages, including for death, economic losses, loss of enjoyment of life, loss of relationships, suffering, pain, and other special damages, all in amounts to be proven at trial.

300.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, prejudgment interest and costs as allowable by federal law.

301.    The Estate is also entitled to punitive damages against Turn Key, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

302.     The Estate is also entitled to punitive damages against Turn Key, in that their

actions were taken maliciously, willfully or with a reckless or wanton disregard of the

constitutional rights of Plaintiff.

**THIRD CLAIM FOR RELIEF**
**Wrongful Death**
**(by Plaintiff Anna Peterman against Defendant Turn Key)**

303.     Plaintiff Anna Peterman incorporates by reference the foregoing paragraphs of

this Complaint as if set forth fully herein.

304.     Plaintiff Anna Peterman brings this claim against Defendant Turn Key.

305.     Plaintiff Anna Peterman is the child and heir of Christina Rogers.

306.     Turn Key is a private corporation that contracts with Weld County to provide

medical care and health services to inmates at the jail.

307.     Turn Key is vicariously liable for the negligent acts and omissions of their agents

and/or employees, including but not limited to, Individual Defendants.

308.     Individual Defendants are private individuals, not governmental actors, and are

therefore not entitled to any immunity under the Colorado Governmental Immunity Act.

309.     Individual Defendants, and any other medical care workers interacting with Ms.

Rogers during the relevant time period, had a duty to provide care to inmates, including Ms.

Rogers.

310.     The Individual Defendants had a nurse-patient or nurse-practitioner-patient

relationship with Ms. Rogers and were acting within the scope of their employment.

311.    With respect to their care and treatment of Ms. Rogers, the Individual Defendants owed her a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical personnel in similar situations.

312.    Through their actions and omissions, the Individual Defendants breached their respective standards of care and were negligent in failing to properly assess, monitor, treat, document, and care for Ms. Rogers, causing her death.

313.    These duties of care are also informed by state law.  Under C.R.S. § 16-3-401, "prisoners arrests or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment."  The provision of adequate medical treatment and humane care is a statutory obligation.

314.    Turn Key had an independent duty to implement reasonable policies and exercise reasonable care in the training of health care workers at the Weld County Jail and ensuring adequate staffing and resources.

315.    Turn Key breached its duty directly to exercise reasonable care in a manner that provided inmates with reasonable medical care and treatment.

316.    As a direct and proximate result of Turn Key's own negligence in staffing, training and supervision, as well as vicariously for its employees, Plaintiff Peterman has suffered damages, losses and injuries in an amount to be determined by the jury at trial.  These damages include, *inter alia*, upset, grief, loss of their mother, impairment in the quality of their lives, anger, depression, and all other purely economic and non-economic damages under the Colorado Wrongful Death Act.

## FOURTH CLAIM FOR RELIEF
### Negligence in the Operation of a Jail Causing Wrongful Death
### (by Plaintiff Anna Peterman against Defendants BOCC and Sheriff Reams)

317.    Plaintiff Anna Peterman incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

318.    Plaintiff Anna Peterman brings this claim against Defendants BOCC and Sheriff Reams, in his official capacity.

319.    Pursuant to the Colorado Governmental Immunity Act (CGIA), Colo. Rev. Stat. § 24-10-106, governmental immunity is waived for any action by a pre-trial detainee for injuries, which lie in tort or could lie in tort, resulting from the negligent operation of any correctional facility or jail.

320.    Plaintiff provided timely notice of claims under Colo. Rev. Stat. § 24-10-109.

321.    At all times relevant to this Complaint, Ms. Rogers was incarcerated as a pre-trial detainee.

322.    Weld County is vicariously liable for the negligent acts and omissions by its agents and/or employees who were acting in the scope of their employment.

323.    At all times relevant to this action, Ms. Rogers was in the custody and care of Weld County staff.

324.    The operation of a correctional facility for purposes of the CGIA includes adequate provision of medical and mental-health care necessary for basic health, and adequate provision of protection from deficient medical care and death.

325.    The Weld County Defendants had a duty to provide reasonable care to ensure that the medical providers hired by the County to provide care to inmates in its custody was sufficient

and that the providers were overseen and known to be providing adequate care for the inmates they serve.

326.    As alleged herein, the Weld County Defendants breached these duties by their negligent acts and omissions, including, but not limited to:

a)  Employing deliberately indifferent hiring practices for the jail medical provider, prioritizing cost over inmate health and safety; and

b)  Failing to oversee and supervise Turn Key in its provision of medical care to inmates in their custody.

327.    As a direct and proximate result of these Defendants' unlawful acts and omissions, Plaintiff Anna Peterman has suffered damages, losses and injuries in an amount to be determined by the jury at trial.  These damages include, *inter alia,* funeral expenses, pain and suffering, upset, grief, loss of companionship, anger, and all other damages as allowed under state law.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to enter judgment in their favor and against each of the Defendants, and award them all relief as allowed by law and equity, including, but not limited to, the following:

a)    All appropriate relief at law and equity;

b)    All available compensatory damages, including, but not limited to, all available damages for pain and suffering, physical, mental and emotional distress, and all other noneconomic and economic damages available under the law;

c)    Punitive damages on all federal claims as allowed by law and in an amount to be determined at trial against all Individual Defendants and Turn Key Defendants;

d)    Pre-judgment and post-judgment interest at the highest lawful rate;

e)    Attorneys' fees and the costs associated with this action as allowed by law, including expert-witness fees; and

f)    Any further relief that this Court deems just and proper, and any other relief as allowed by law.

PLAINTIFFS REQUEST A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.

Dated this 18th day of November 2024.

Respectfully submitted,

s/Aurora L. Randolph

**Aurora L. Randolph**
ALR Civil Rights LLC
9878 W. Belleview Ave.
Suite 2129
Denver, CO 80123
Phone: (303) 968-1703
Email: aurora@alrcivilrights.com

*Attorney for Plaintiffs*